IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| ALONZO NOWELL | : | NO. 22-27 |

**OPINION**

**Slomsky, J.**                                                                                                                           **January 6, 2023**

## I. INTRODUCTION

In this criminal case, Defendant Alonzo Nowell is charged with unlawfully possessing a firearm while being a felon. The charge arose on December 21, 2021, when officers of the Philadelphia Police Department's ("PPD") 39th District Violent Crime Reduction Task Force ("VCRT"), in conjunction with agents of the Drug Enforcement Agency ("DEA") and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") (collectively all referred to as "Task Force Officers" or "TFOs") surveilled a high crime area. Their surveillance led to the arrest of Defendant and the search of a black Dodge Durango Hellcat (the "vehicle" or "Durango") that he was driving and that was registered to him. During the search, Task Force officers recovered from a modified compartment in the middle of the floor near the second row of seats a .40 caliber Glock 22 (the "firearm") loaded with a full magazine of fourteen (14) live rounds of ammunition and one live round in the chamber. (See Doc. No. 35-1 at 3.) They also found in the same compartment another fully loaded magazine. (See id.)

After discovering the firearm and the additional magazine, Defendant was arrested and searched. During the search, the Task Force Officers found in Defendant's pants pocket a card with radio-frequency identification ("RFID") capabilities, which was later discovered to lock and unlock a trap door on top of the modified compartment in the vehicle where the firearm was found.

1

They also found on him over $1,800 in cash.[1] On January 26, 2022, a grand jury indicted Defendant for possession of a firearm by a felon, in violation of 18 U.S.C.§ 922(g)(1).

Before the Court is Defendant's Motion to Suppress Physical Evidence in which, as noted, he seeks only to suppress the firearm and the ammunition. (Doc. No. 23.) In his Motion, Defendant contends that: (1) the officers lacked probable cause to search his vehicle; (2) the officers did not have reasonable suspicion to frisk him for the presence of weapons; (3) the officers did not have reasonable suspicion to extend that unlawful frisk to his vehicle. (See id. at 7-8.)

The Government filed a Response in Opposition raising three grounds to support the lawfulness of the search of Defendant and the vehicle, and the seizure of the firearm and ammunition. (Doc. No. 27.) First, the Government argues that there was probable cause to search the entire vehicle and to arrest Defendant. (See Doc. No. 35 at 25-27.) Second, the initial stop of Defendant was lawful because he violated several traffic laws and Sergeant Andrew Callaghan, who stopped the Dodge Durango and subsequently conducted a Terry frisk of him, had reasonable suspicion that Defendant was armed and dangerous sufficient to justify the Terry frisk. (See Doc. No. 27 at 7-10.) Third, the Terry frisk of Defendant properly extended into the backseat of the vehicle and the seizures of the items discovered in the modified compartment. (See id. at 10-11.)

On July 19, 2022, an evidentiary hearing was held on the Motion to Suppress, during which TFOs involved in the surveillance operation testified. (Doc. No. 28.) Following the hearing, the parties were instructed to file proposed findings of fact and conclusions of law. (See Doc. No. 32 at 253-54.) On September 21, 2022, Defendant filed a Memorandum in Support of the Motion to Suppress (Doc. No. 34), and on September 22, 2022, the Government filed in opposition Proposed

---

[1] In his Motion, Defendant seeks to suppress only the firearm and ammunition found in the Dodge Durango, not the RFID card or the cash taken from him.

Findings of Fact and Conclusions of Law Regarding Defendant's Motion to Suppress (Doc. No. 35). Because there was probable cause to search Defendant's vehicle, including the modified compartment which contained the firearm and ammunition, Defendant's Motion to Suppress Physical Evidence (Doc. No. 23) will be denied.

## II.   FINDINGS OF FACT

### A.   Surveillance of Defendant and an Unknown Man

The evidentiary hearing was held on July 19, 2022. The Court heard testimony from Drug Enforcement Agency ("DEA") TFO Kathaleen Cerebe ("TFO Cerebe"), PPD Sergeant Andrew Callaghan ("Sergeant Callaghan"), and PPD Officer Zachary Stout ("Officer Stout") and watched dashcam footage recorded by Sergeant Callaghan and other video footage recorded by TFO Cerebe.[2] The following facts were adduced at the hearing.

---

[2]   TFO Cerebe has been a law enforcement officer for over thirty-two (32) years. (See Doc. No. 32 at 8.) After serving twenty-six years as a police officer for the Philadelphia Police Department's ("PPD") Narcotics Unit, TFO Cerebe served as a member of the Narcotics Strike Force Unit for six-and-a-half years. (See id.) In addition, as of the date of the evidentiary hearing, she had been a TFO for the DEA for three years while part of the Narcotics Strike Force Unit. (See id. at 7.)

Sergeant Callaghan had thirty-three years of law enforcement experience as of July 19, 2022, twenty-seven of which he spent with the Narcotics Unit. (See id. at 51.) Sergeant Callaghan started his service with the PPD as a patrol officer for three years until he was transferred to the Narcotics Unit. (See id. at 52.) At some point during his position with the Narcotics Unit, he was promoted to the rank of detective and served in that position for a year-and-a-half. (See id.) Afterwards, he was transferred back into the Narcotics Unit. From 2000 to 2006, Sergeant Callaghan was a TFO for the Federal Bureau of Investigation ("FBI"). (See id.) In 2012, he was promoted to Sergeant, served on patrol for a year-and-a-half, and then returned to the Narcotics Unit as TFO for the DEA. (See id.) He had also served as a TFO for the DEA on a prior occasion. (See id.) All three stints as a TFO for the FBI and DEA were related to narcotics investigations. (See id.) In his current role, he supervises seventeen (17) PPD officers and three or four DEA agents. (See id.)

Officer Stout has served five years as a police officer assigned to the 39th District of Philadelphia. (See id. at 186-87.) He started as a patrol officer, served as a member of the tactical unit for three years, and then became an officer in the Violent Crimes Reduction Team

On December 21, 2021, TFO Cerebe, Sergeant Callaghan, and Officer Stout were in the area around 32nd and Allegheny Streets in Philadelphia conducting a prearranged surveillance called Operation Overdrive, which consisted of coordination between the DEA and the PPD's 39th District to investigate crimes involving drugs, guns, and homicides.[3]  (See Doc. No. 32 at 8-9, 54-55.)  This area of Philadelphia is known as a high-crime area and is designated as a "shooting grid."  (Id. at 251.)  Specifically, based on information from officers in the 39th District, Operation Overdrive was focused on "the area around the bar of 32nd and Allegheny" because of "narcotics activity . . . as well as an increase in . . . shootings in that area [on December 20, 2021]."  (Id. at 9-10.)  During their surveillance, TFO Cerebe, Sergeant Callaghan, Officer Stout, and other uniformed and plainclothes officers from the 39th Police District were in continuous radio contact with each other.  (See id. at 11.)  About fifteen TFOs and officers were on the same radio band.  (See id. at 242.)

At 5:55 p.m., TFO Cerebe observed the Dodge Durango pull into a back alleyway off 32nd Street and behind the bar area which was the target of Operation Overdrive's surveillance that night.  (See id. at 11.)  The Durango then exited the alleyway, drove onto Allegheny Avenue, and made a right turn back onto 32nd Street facing southbound.  (See id.)  It then "park[ed] on the west side [of the street] in front of the bar area."  (Id.)  At some point, TFO Cerebe received information over the radio that the driver of a Dodge Durango was known to law enforcement and, based on historical information, was involved in possible narcotics activity.  (See id. at 11-12.)

---

("VCRT").  (See id. at 187.)  Approximately ninety-five (95) percent of Officer Stout's current position in the VCRT involves narcotics investigations.  (See id.)

[3]  The DEA utilizes TFOs in conjunction with the various districts within the PPD because Philadelphia police officers "know the district better than [the DEA does]."  (Id. at 188.)

Shortly after observing the Durango, TFO Cerebe saw an unknown male wearing a dark jacket walk from Allegheny Avenue and enter the Durango's passenger seat. (See id. at 12.) TFO Cerebe then accessed a closed-circuit television ("CCTV") camera located on a light pole located at the intersection of 32nd and Allegheny Streets.[4] (See id. at 12.)

At approximately 6:01 p.m., TFO Cerebe used the camera to capture real-time footage of the Durango. (See id. at 21.) By the time she had accessed the camera at 6:02 p.m., the unknown passenger was standing outside on the sidewalk in front of the bar and near the Durango. (See id. at 23.) He appeared to be speaking for a minute or two to the driver of the Durango through the passenger side front window. (See id.) TFO Cerebe then observed the unknown man walk southbound away from the Durango in the middle of 32nd Street. (See id. at 13.) Twenty to thirty seconds later and a half of a block away from the Durango, a dark Nissan Altima, also driving southbound on 32nd Street, pulled up and stopped next to him, and the driver opened his door. (See id. at 13-14.) The unknown man then appeared to remove something from his left jacket pocket and bent down to talk to the driver of the Altima. (See id.) After he bent down, the unknown man handed him "an unknown item." (Id.) The driver of the Altima, who remained seated in the Altima with his feet "partially out of the vehicle," then counted out cash and handed it to the unknown man. (Id. at 14.) Next, the driver of the Altima closed his door, continued driving southbound on 32nd Street and made a left turn at the first intersection onto Clearfield Street. (See id.)

---

[4] PPD Officers had access through a cell phone application to several cameras positioned on light poles to record events such as accidents and crimes. (See id. at 19-20.) The officer with access to these cameras can control in real-time the angle of the camera and can focus on different vantage points. (See id. at 22.)

During this transaction, Defendant remained in the Durango. (See id. at 39.) When the Altima drove away, TFO Cerebe then dispatched the direction of the car over police radio. (See id. at 24.) The unknown man then walked back to the Durango, which was starting to pull away from the bar area, and had another conversation with Defendant. (See id. at 17.) Then, the Durango drove half a block down 32nd Street and made a right turn at Lippincott Street. (See id.) The unknown man was never identified. (See id. at 17-18, 25.)

Meanwhile, Officer Stout and his partner, Officer Rozinski, stopped the Altima shortly after the driver made the drug transaction with the unknown man and retrieved from the driver a small amount of marijuana. (See id. at 15.) The driver informed Officers Stout and Rozinski that he had "just purchased [the marijuana] from . . . a male, an older male on 32nd Street." (Id. at 16.) The driver was issued a ticket and was released. (See id. at 195.) Based upon this information, TFO Cerebe knew that there was a drug transaction between the driver of the Altima and the unknown man who shortly before had briefly entered Defendant's car, left the car, completed the illicit drug transaction, and then walked back and spoke with Defendant who was still in the Durango. (See id.)

### B.  Sergeant Callaghan's Pursuit of Defendant

At that point, a decision was made to follow the Durango to observe if it made any stops "indicative of a person in the area selling drugs." (Id. at 45.) Police radio noted the direction of the Durango. At approximately 6:20 P.M., Sergeant Callaghan, who was in an unmarked Cadillac Escalade, spotted the Durango while driving eastbound on Indiana Avenue near 26th Street. (See id. at 25-26, 58-59.) For several minutes, he followed the Durango without activating his lights or sirens. Sergeant Callaghan saw Defendant engage in a variety of evasive driving techniques while he followed him for several blocks still without activating his lights and sirens.

6

First, Defendant did not come to a complete stop at the intersection of 26th Street and Indiana Avenue. (See id. at 72.) He finally did so at the intersection of 24th Street and Indiana Avenue.[5] (See id.) Next, Sergeant Callaghan followed Defendant as he approached a red light at the intersection of 23rd Street and Indiana Avenue. (See id.) For about five seconds after the light turned green, Defendant did not accelerate, a technique Sergeant Callaghan believed, based on his training and experience, was "designed to detect law enforcement." (Id. at 61-62.) Defendant continued for another block and stopped at a red light at the intersection of 22nd Street and Indiana Avenue. (See id. at 62.) Defendant then again quickly accelerated toward the next intersection while driving well above the 25-mile-per-hour speed limit. (See id. at 62-63.) As Defendant approached the intersection of 21st Street and Indiana Avenue, Defendant activated his right turn signal, then his left turn signal, shut it off, and then turned right without activating his turn signal again. (See id. at 63.)

Defendant drove to the next intersection at Cambria Street and made another right turn at 21st and Cambria Streets without using his turn signal. (See id. at 74.) He was now traveling in the exact opposite direction he was traveling when Sergeant Callaghan first started following him. (See id. at 63-64.) At the next intersection, 22nd and Cambria Streets, Defendant drove through a red light as two pedestrians were about to cross the intersection in front of his vehicle.[6] At that moment, Sergeant Callaghan believed that Defendant knew that the driver of Callaghan's car would have to wait until the pedestrians cleared the intersection and this maneuver would give

---

[5] Sergeant Callaghan believed that Defendant was traveling between forty-five and fifty-five miles per hour between the intersections of 26th Street and Indiana Avenue and 24th Street and Indiana Avenue. (See id. at 63.)

[6] Sergeant Callaghan estimated that Defendant was traveling about 50 miles per hour between the intersections of the 2100 and 2200 blocks of Cambria, double the posted speed limit of 25 miles per hour. (See id. at 75.)

7

Defendant more time "to gain space between [Sergeant Callaghan and Defendant]." (Id. at 64-65.) After the pedestrians crossed the intersection, Sergeant Callaghan activated his lights and sirens and pursued Defendant. (See id. at 65.) Defendant next made a right turn at the intersection of 23rd and Cambria Streets on a red light. (See id. at 76.) At that intersection, there was a sign which read: "No Turn on Red." (See id. at 76; see also Doc. No. 35-1 at 1.)

Defendant then proceeded through the intersection of 23rd Street and Indiana Avenue, which was the next street after Cambria. Defendant was now back at the same intersection where he had initially refrained from accelerating after the red light turned green in what Sergeant Callaghan believed was an attempt to determine whether he was a police officer. Defendant then drove one more block down 23rd Street, again speeding. (See id. at 76.) Defendant turned left on a red light from 23rd Street onto Fox Street, traveled another block, and turned right onto Allegheny Avenue. (See id. at 76-77.) From Allegheny, Defendant traveled another two blocks, turned right onto 22nd Street, and finally pulled over a block later at the intersection of 22nd and Clearfield Streets at approximately 6:24 P.M, four minutes after Sergeant Callaghan first observed the Durango. (See id. at 77-78.)

Thus, Defendant drove a minimum of six (6) blocks, including four turns and committing several traffic violations, all while Sergeant Callaghan pursued him with his activated lights and sirens. Sergeant Callaghan testified that he believed that Defendant's frequent turning suggested Defendant was trying to dispose of contraband. (See id. at 68.) In this regard, Sergeant Callaghan testified at the evidentiary hearing as follows:

> [B]ased on my training and experience, if somebody wanted to flee or leave the area, they would just drive straight.
>
> Normally, when somebody is making turns, it's because they're trying to – if they speed up, before they'd make a turn in order to gain distance, then, that's usually

8

to throw out contraband, either[] out the window, somewhere in the car, they're just trying to gain distance at that point.

(Id.) Sergeant Callaghan did not testify that he saw anything thrown from the Durango during his pursuit.

### C. Sergeant Callaghan's Stops Defendant and His Vehicle Is Searched

After Defendant pulled over at the intersection of 22nd and Clearfield Streets, Sergeant Callaghan, still in his vehicle, requested additional officers to go to his location. (See id. at 79.) He then exited his vehicle and approached the Durango from the driver's side. (See id. at 86.) Sergeant Callaghan observed that Defendant appeared to be nervous, sweating, and shaking. (See id.) After Sergeant Callaghan approached the vehicle's driver, he asked for his driver's license and vehicle registration. (See id. at 85.) The driver was confirmed to be Alonzo Nowell. (See id.) Defendant complied with Sergeant Callaghan's request that he exit his vehicle. (See id. at 142, 244.)

### D. Officer Stout's Testimony

Officer Zachary Stout, who had recovered the marijuana from the driver of the Altima, arrived on the scene. Before arriving, Officer Stout heard whom he believed to be Officer Stasic on his police radio.[7] Officer Stasic was partnered with TFO Cerebe that night and broadcast that Alonzo Nowell was the registered owner or lessor of the Durango. (See id. at 241-42, 249.) This information was sourced from a check of the license plate on the Durango. (See id. at 241.) Officer

---

[7] Officer Stout testified that as many as fifteen TFOs were participating in Operation Overdrive on the night of Defendant's arrest. (See id. at 242.) All the officers involved in this surveillance were on the same radio band and were in direct contact with one another. (See id. at 11, 54.) Sergeant Callaghan himself supervised eight PPD officers and three or four DEA agents. (See id. at 53.) In addition, a special agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF") assisted with Operation Overdrive and was on the same surveillance band that night. (See id. at 55-56.)

Stasic also informed Officer Stout over police radio that Alonzo Nowell was a convicted felon and known in the area for narcotics sales.[8] (See id. at 191-92.) While other officers and agents maintained control over Defendant, Sergeant Callaghan searched the area where the driver sat. (See id. at 91.) Next, Sergeant Callaghan asked nearby officers to search the "rest of this vehicle" to determine whether there were additional passengers in the rear of the Durango. (Id. at 92.) He did so because he could not see inside the vehicle through the heavily tinted windows and wanted to ensure officer safety by ruling out the presence of other individuals in the back seat of the vehicle. (See id. at 84.)

### E.     The Search of the Vehicle

Officer Stout and another officer then searched the entire vehicle, first the passenger and driver's seats, respectively. (See id. at 93, 223.) At the same time, another officer appeared to unlock all of the doors from the front driver's seat door and, for approximately 55 seconds, searched the area near the Durango's second row of seats. (See id. at 222.) Officer Stout had entered the Durango by the front passenger door and checked the front and rear passenger side of the vehicle, as well as the rear of the vehicle. (See id. at 199.) During his search, Officer Stout discovered a trap door over a compartment located on the floor between the second row of seats. (See id. at 199-200.) Officer Stout lifted the unlocked trap door, opened the compartment, and discovered the firearm. (See id. at 200-01.) After he located the firearm, Officer Stout signaled to his partner, Officer Rozinski, to arrest Defendant who was a convicted felon.[9] (See id. at 201.)

---

[8] Although TFO Cerebe testified at the hearing about her use of the pole camera, her observations of the marijuana transaction involving the unknown male passenger and the driver of the Altima, and her observations after arriving at the intersection of 22nd and Clearfield Streets, she was not asked about the role Officer Stasic had in the investigation. Officer Stasic did not testify at the hearing.

[9] "Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony." United States

10

Defendant was escorted from behind his vehicle to a different corner of the intersection. (See id. at 97.) There, officers searched him incident to his arrest and informed Sergeant Callaghan that Defendant had cash and a radio-frequency identification ("RFID") card on his person. (See id.) Then, Sergeant Callaghan and Officer Stout went to Defendant, searched him, and recovered $1,812 in cash in one of Defendant's pants pockets and the RFID card in the other pocket.[10] (See id. at 97-98.) The firearm and magazine were then secured by other agents and a full search of the Durango was conducted back at DEA headquarters where Officer Stout demonstrated how the RFID card unlocks the trap door. (See id. at 203.)

### III. CONCLUSIONS OF LAW

In the Motion to Suppress, Defendant argues that there was no probable cause to search his vehicle and seize the firearm from the compartment in the floor of the second row of the vehicle. (Doc. No. 23 at 6-8.) He also argues that there was no reasonable suspicion to frisk him and to extend that frisk to the Durango. (See id. at 7-8.)[11] For reasons that follow, Defendant's Motion to Suppress (Doc. No. 23) will be denied.

#### A. Law Regarding Probable Cause to Search a Vehicle

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It provides that this right "shall not be violated, and no Warrants shall issue, but upon probable

---

v. Burton, 288 F.3d 91, 98 (3d Cir. 2002) (internal quotation marks omitted) (quoting United States v. McGlory, 968 F.2d 309, 342 (3d Cir. 1992) (citation omitted)).

[10] Sergeant Callaghan recovered the cash and Officer Stout recovered the RFID card. (See id. at 98.) Again, as noted above, Defendant is not seeking suppression of the cash or the RFID card seized from his person incidental to his arrest.

[11] Because there was probable cause to search Defendant's vehicle and that search lawfully extended to all areas inside the vehicle, the Court need not consider whether Sergeant Callaghan had reasonable suspicion to frisk Defendant or to extend that frisk to his vehicle.

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. Evidence obtained in violation of the Fourth Amendment may not be introduced at trial. See Davis v. United States, 564 U.S. 229, 232 (2011). On a motion to suppress, "the burden of proof is on the defendant who seeks to suppress evidence." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (internal citations omitted). Generally, warrantless searches are presumed to be unreasonable; suppression of all evidence obtained from an unreasonable search is the appropriate remedy. See id. (citing Cady v. Dombrowski, 413 U.S. 433, 439 (1973)).

One exception to the warrant requirement is the automobile exception. "The automobile exception permits vehicle searches without a warrant if there is 'probable cause to believe that the vehicle contains evidence of a crime.'" United States v. Donahue, 764 F.3d 293, 299-300 (3d Cir. 2014) (citation omitted). In Donahue, the Third Circuit elaborated on the automobile exception:

> Although "the scope of the warrantless search authorized by [the automobile exception] is no broader and no narrower than a magistrate could legitimately authorize by warrant," United States v. Ross, 456 U.S. 798, 825, 102 S. Ct. 2157, 2173 (1982), the automobile exception includes two important elements specific to that exception: First, "[i]f probable cause justified the search . . . , it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id., S. Ct. at 2173. Second, probable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component. Maryland v. Dyson, 527 U.S. 465, 466, 119 S. Ct. 2013, 2014 (1999).

Id. at 300. Under the automobile exception, if there is a "fair probability" that evidence of a crime or contraband would be found in a vehicle, then there is probable cause to search the vehicle. Id. at 301 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

"The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical'; it is based on the totality of the circumstances and is judged by the standard of "reasonable and prudent men." . . . "At bottom," the probable cause analysis "deal[s] with probabilities." United States v.

12

Williams, 898 F.3d 323, 340 (3d Cir. 2018) (quoting Donahue, 764 F.3d at 301 (internal quotation marks and citations omitted)). Put differently, a district court must "evaluate 'the events which occurred leading up to the . . . search, and then . . . [decide] whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to . . . probable cause.'" Donahue, 764 F.3d at 301 (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). Probable cause does not require "the actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally." Burton, 288 F.3d at 98 (citing Gates, 462 U.S. at 243 n.13). And "[t]he arresting officer need not have contemplated the specific offense for which the defendant ultimately will be charged. The appropriate inquiry, rather, is whether the facts and circumstances within the officer's knowledge at the time of an investigative stop or arrest objectively justify that action." United States v. Laville, 480 F.3d 187, 194 (3d Cir. 2007).

**B.      Probable Cause Is Based on the Collective Knowledge of the Officers**

Probable cause to search, seize, or arrest is assessed based on the collective knowledge of officers effectuating that search, seizure, or arrest. Under the collective knowledge doctrine, one officer's knowledge is imputed to another officer who conducts a search, seizure, or arrest. See United States v. Whitfield, 634 F.3d 741, 745 (3d Cir. 2010) (citing United States v. Belle, 593 F.3d 497, 497 n.15 (3d Cir. 1979)). "[T]he arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause." Williams, 898 F.3d at 340 (quoting United States v. Burton, 288 F.3d 91, 99 (3d Cir. 2002)). The Third Circuit has "held that '[a]n officer can lawfully act solely on the basis of statements issued by fellow officers.'" Id. (quoting Burton, 288 F.3d at 99). Under the collective knowledge doctrine, "[t]he appropriate inquiry . . . is whether the facts and circumstances within the officer's knowledge at the time of an investigative stop or arrest

13

objectively justify that action." Laville, 480 F.3d at 194 (citing Devenpeck v. Alford, 543 U.S. 146, 153 (2004)). The same precept applies to whether there is probable cause to search a vehicle. Thus, whether there is probable cause to search a vehicle depends on the collective knowledge of the totality of the circumstances viewed from the standpoint of an objectively reasonable officer.

      **C.**      **The Evidence Offered at the Evidentiary Hearing Shows That There Was Probable Cause to Search the Dodge Durango**

The Government asserts that the following nine collective facts were known by each of the testifying officers and collectively were sufficient to establish probable cause to search the vehicle:

> (1) [T]he Durango was registered to Nowell (Stout); (2) Nowell was a convicted felon (Stout); (3) the driver of the Durango (Nowell) was known for historic drug sales in the area (Stout, Cerebe); (4) approximately 20 minutes earlier, the UM [(unidentified man)] sold drugs mere seconds after interacting with the driver of the Durango (Cerebe, Stout, Callaghan); (5) the Durango made evasive maneuvers designed to ferret out whether it was being followed by law enforcement (Callaghan); (6) after Sgt. Callaghan activated his lights and sirens, the Durango continued to drive evasively at a high rate of speed and commit traffic violations, and did not pull over for approximately six blocks and four turns (Callaghan); (7) Sgt. Callaghan believed these evasive maneuvers were designed to give Nowell enough time to dispose of or hide contraband (Callaghan); (8) it was night time in a high crime area known for drug dealing and shootings (Cerebe, Callaghan, Stout); and (9) Nowell was visibly nervous, shaking, and sweating (Callaghan). Based on the totality of the circumstances, a reasonable officer in Sgt. Callaghan's position would have reasonably believed Nowell – a convicted felon and known drug dealer who was frequenting a high crime area known for drug sales and gun violence – had participated in a drug transaction with the UM, and that Nowell had fled from Sgt. Callaghan to avoid being caught with narcotics or to give himself time to dispose of or hide contraband of drug trafficking, including a firearm or narcotics.

(Doc. No. 35 at 26-27.)

The crux of the Government's argument is that the TFOs had sufficient collective knowledge to search the Durango. The Court agrees. For reasons that follow, the totality of the circumstances here based on the collective knowledge of the officers, when viewed from the

standpoint of an objectively reasonable police officer, gave rise to probable cause to search Defendant's vehicle, seize the firearm and ammunition, and to arrest Defendant.[12]

Here, not only was the area around 32nd Street and Allegheny Avenue a high-crime area known for narcotics and firearm activity—a shooting grid—but the area immediately surrounding the bar at that intersection also was the specific target of Operation Overdrive on the night of Defendant's arrest. Defendant drove out of an alleyway behind the bar and parked his Durango directly in front of the bar. Next, an unknown male entered and sat in the passenger seat of the parked Durango, waited a few minutes, and then engaged in an illicit drug deal with the driver of another vehicle. Immediately after the drug transaction, the unknown male walked back to the Durango to talk to Defendant.[13] Around this same time, information that Defendant, as the registered owner of the Durango, was a convicted felon and was known for historical drug sales in the area was dispatched over police radio to the TFOs.

Defendant then violated several traffic laws, including speeding, going through red lights, and turning without activating his turn signals, all in an attempt to detect whether he was being followed by law enforcement and to lose Sergeant Callaghan. He also engaged in these evasive driving maneuvers designed to both avoid arrest and probably to dispose of contraband.[14] In

---

[12] Although the Government's summary of the evidence is accurate, it is only a summary and does not contain all the critical evidence presented at the evidentiary hearing to establish probable cause to search the vehicle. A more thorough statement of the facts follows and analysis is provided.

[13] Defendant's proximity to and interaction with the unknown male passenger immediately before and after he made the drug transaction with the driver of the Altima contributes to the probable cause in light of other factors such as Defendant's presence in a high-crime area and reputation as a drug dealer. See United States v. Pitts, No. 10-703, 2011 WL 940245, at *7 (E.D. Pa. Mar. 15, 2011) ("[P]roximity to a suspicious individual plus other relevant circumstances may create probable cause.") (citing United States v. Tehrani, 49 F.3d 54, 59 (2d Cir. 1995)).

[14] "[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating

addition to Defendant's speeding, turning without turn signals, and going through red lights while Sergeant Callaghan had not yet activated his light and sirens, Defendant's circuitous route—rather than driving straight-away from the area—suggested to Sergeant Callaghan that he was trying to dispose of contraband. Sergeant Callaghan then activated his lights and sirens, but this police presence did not stop Defendant from fleeing at high speed for six blocks and making several turns, eventually returning to the spot where he first started to detect the presence of law enforcement following him.[15] And after Sergeant Callaghan finally stopped Defendant, he appeared to be nervous, was sweating, and was visibly shaking.[16]

Additionally, the Government places significant weight on Defendant's interaction with the unknown man who had entered and exited the Durango and who did the marijuana transaction with the driver of the Altima. TFO Cerebe observed the unknown male meet with Defendant in his vehicle, leave the vehicle, make a marijuana transaction with another individual within seconds of leaving Defendant's vehicle, and returned for a conversation with Defendant before both

---

the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest." Laville, 480 F.3d at 195 (internal quotation marks omitted) (quoting Sibron v. New York, 392 U.S. 40, 66-67 (1968)).

[15] In the context of flight from law enforcement officers, "our Court of Appeals has noted that unprovoked flight can contribute to the calculus [sic] of establishing probable cause where there are other circumstances that indicate 'an individual is engaged in criminal activity.'" United States v. Morrison, No. 19-144, 2022 WL 130776, at *8 (W.D. Pa. Jan. 14, 2022) (quoting United States v. Acosta, 751 F. App'x 201, 203 (3d Cir. 2018) (citing United States v. Navedo, 694 F.3d 463, 474 (3d Cir. 2012))); see also 2 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.6 (4th ed. 2007) (cited by Laville, 480 F.3d at 195) ("[I]f there already exists a significant degree of suspicion concerning a particular person . . . , the flight of that individual upon the approach of the police may be taken into account and may well elevate the pre-existing suspicion up to the requisite Fourth Amendment level of probable cause.").

[16] Nervousness and evasive behavior are relevant for probable cause purposes. See United States v. Baley, 505 F. Supp. 3d 481, 497 (E.D. Pa. 2020) (citing United States v. Jackson, 682 F. App'x 86, 88 (3d Cir. 2017)).

Defendant and the unknown man left the area. Much of the surveillance on Defendant was predicated on TFO Cerebe's testimony that "based on previous information and based on [the] sale from the Nissan Ultima [sic], an interaction with that unknown male with the operator of the Durango, a decision was made to follow" the Durango "to see if [it] stopped anywhere else, [or] met up with any other individuals." (Doc. No. 32 at 18.) Defendant's interaction with the unknown male both immediately before and after he made a marijuana transaction weighs in favor of a finding of probable cause.[17]

An instructive case on probable cause based on a defendant's proximity to a drug transaction is United States v. Reyes, 225 F.3d 71, 73 (1st Cir. 2000). In Reyes, the defendant was in the passenger side of a vehicle that stopped at a suspected drug dealer's house. After the driver grabbed something from underneath the truck, the defendant, the driver, and another passenger

---

[17] One's interactions with confirmed drug transactions also can contribute to a finding of probable cause to search or arrest that individual. In United States v. Lloyd, law enforcement officers observed the defendant make what they believed to be drug deals with two different individuals. No. 21-81, 2022 WL 2916684, at *4-5 (E.D. Pa. July 22, 2022). Both individuals were later stopped by police and were found to possess illicit drugs. Id. at *5. Additionally, after the second transaction, the defendant "open[ed] the trunk of his Nissan Altima and move[d] items around." Id. This Court stated that:

> Even though Defendant was not driving his car and was not inside the car when the officers observed drug trafficking, shortly after observing the two illicit drug sales, the officers saw Defendant unlock the Nissan Altima, open the trunk, and move items around. This series of events gave the officers probable cause to believe that Defendant's car was the place where he stored his drug supply. Because probable cause existed, the officers were permitted to search the entire vehicle, including concealed compartments that could hide the object of the search.

Id. (footnote omitted).

Although the officers here did not observe Defendant directly engage in a drug transaction, the series of events surrounding his interaction with the unknown male immediately before and after he made a later-confirmed drug transaction contributes to the probable cause. And unlike in Lloyd, and as described above, there are additional factors occurring in this case to support probable cause to search Defendant's vehicle.

17

entered the drug dealer's home. 225 F.3d at 73. Shortly thereafter, the truck's three occupants returned to the truck and the driver placed something underneath the truck at the same location where he had removed something prior to entering the house. See id. at 73-74. The court concluded that the defendant's "presence during and participation in such suspicious activities as the orchestrated entrances into and exits from the house, and the minutes spent in the truck looking around, were neither innocent nor ignorant." Id. at 76.

Here, by comparison, Defendant's interaction with the unknown man who participated in an illicit drug transaction immediately before and after talking to Defendant contributes to probable cause to search his vehicle. As explained above, TFO Cerebe observed Defendant's vehicle drive through a back alleyway, after which she received information that the driver of the vehicle was possibly involved in narcotics activity in that area. Shortly after Defendant exited the alleyway and parked by the intersection of 32nd Street and Allegheny Avenue, the unknown man entered the passenger side door of Defendant's vehicle, stayed with Defendant for about a minute or two, and then exited the vehicle and walked southbound in the middle of the street to meet a Nissan Altima actively driving towards him. The Altima stopped, the unknown man handed him something later discovered to be marijuana, the driver of the Altima handed the unknown man cash, and the unknown man walked back to talk to Defendant again immediately after the transaction.

Based on these events, TFO Cerebe knew that she "observed a narcotics transaction" and her suspicions that Defendant was involved were "[s]trengthened" when officers confiscated the marijuana from the driver of the Altima. (Doc. No. 32 at 16.) More specifically, she testified that "based on [her] experience, . . . two things were possible with what happened with the Durango, the Durango would have possibly supplied that unknown male with – ah – illegal marijuana or

products to sell on the streets or possibly, that unknown male sold – ah – marijuana to the driver of that Durango."[18] (Id. at 19.) Much like the defendant in Reyes, Defendant's presence here and interactions with the unknown man directly before and after he made a marijuana transaction and his departure from the area shortly after the second conversation between him and the unknown man could be interpreted by a reasonable police officer as "neither innocent nor ignorant." Reyes, 225 F.3d at 76.

In sum, based on the totality of the circumstances here, including, among other things the factual recitation described in detail above, Defendant's reputation for being a drug dealer in the area and a convicted felon, Defendant's interactions with the unknown male passenger immediately before and after the passenger sold marijuana, Defendant's presence in a high-crime area driving in an alleyway behind a bar in an area under surveillance for narcotics and shootings, Defendant's circuitous driving route and prolonged flight from Sergeant Callaghan in a manner indicative of an attempt to dispose of contraband and to lose the police even after Callaghan activated his lights and sirens, and Defendant's sweating, nervousness, and visible shaking in Sergeant Callaghan's presence at the vehicle stop all would lead an objectively reasonable officer

---

[18] An officer's "extensive experience, knowledge of the area and of the heightened drug activity present, and direct observation of the suspects acting in a manner consistent with drug traffickers" can serve as the basis of probable cause. See United States v. Cousin, 219 F. App'x 190, 193 (3d Cir. 2007); see also United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (recognizing "the deference afforded the on-the-scene conclusion of police officers" because that "may well 'draw inferences and make deductions . . . that might well elude an untrained person'") (quoting United States v. Cort, 449 U.S. 411, 418 (1981)). Here, TFO Cerebe's belief that Defendant was involved in illicit drug activity was based on her training, experience, knowledge of the area in connection with Operation Overdrive, and direct observation of Defendant's interactions with the unknown man. In addition, the experience of the other TFOs and their involvement in all the events that evening lead to the conclusion that an objectively reasonable police officer knowing the totality of the circumstances would believe that there is probable cause to search the Durango for contraband.

to conclude that there was probable cause to search Defendant's vehicle for evidence of drug related items or other contraband.

As noted, probable cause is based on probabilities combined with commonsense. Probable means likely to exist or be true. Black's Law Dictionary (11th ed. 2019). Here, all the probabilities of what an objectively reasonable police officer would know, especially based on the experience and knowledge of the officers involved in this operation, point to the fact that there was something illicit in the Durango that the driver did not want the police to find. Police do not have to identify the specific object they are looking for before conducting a search. They only need probable cause to believe that the vehicle contains contraband which would be evidence of a crime. Based on the totality of the evidence presented here, the probabilities are high that there was contraband in the Durango. It turned out to be a loaded firearm and a fully loaded magazine. Thus, because the officers had probable cause to search the Durango under the automobile exception, they could search every part of Defendant's vehicle. Their discovery of the firearm and ammunition in the modified compartment was the product of a lawful search.[19] Consequently, the firearm and ammunition will not be suppressed.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Suppress Physical Evidence (Doc. No. 23) will be denied. An appropriate Order follows.

---

[19] The Government also argues that the plain view exception supports Officer Stout's search of the trap compartment. Under the plain view doctrine, police officers may seize an object without a warrant if: (1) they are "lawfully in a position from which they view the object"; (2) the contraband's "incriminating character is immediately apparent"; and (3) "the officers have a lawful right of access to the object." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). But because the officers had probable cause to search every part of Defendant's vehicle, the Court need not address the plain view doctrine.